# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

July 11, 2018

Lyle W. Cayce
Clerk

No. 17-30438

WHITE OAK REALTY, L.L.C.; CITRUS REALTY, L.L.C.,

      Plaintiffs - Appellants

v.

UNITED STATES ARMY CORPS OF ENGINEERS; THOMAS P. BOSTICK,
Lieutenant General, United States Army Chief of Engineers, in his official
capacity; JOHN W. PEABODY, Major General, Commander, Mississippi
Valley Division, United States Army Corps of Engineers, in his official
capacity; RICHARD L. HANSEN, Colonel, Commander, New Orleans
District, United States Army Corps of Engineers, in his official capacity,

      Defendants - Appellees

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:13-CV-4761

Before WIENER, GRAVES, and HO, Circuit Judges.[1]

PER CURIAM:[*]

This dispute involves a challenge to environmental mitigation
requirements imposed by the U.S. Army Corps of Engineers (the "Corps") as a
prerequisite to excavate and sell soil from private property for use in the

---

[1] Judge Ho concurs in the judgment only.

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not
be published and is not precedent except under the limited circumstances set forth in 5TH
CIR. R. 47.5.4.

No. 17-30438

Corps's projects. Appellant claims the mitigation requirements are contrary to federal law and unconstitutional. The district court granted the Corps summary judgment on all claims. We affirm.

## BACKGROUND

In the wake of Hurricanes Rita and Katrina, Congress tasked the Corps with a series of projects collectively known as the Greater New Orleans Hurricane and Storm Damage Risk Reduction System ("HSDRRS"). The HSDRRS required construction, on an "emergency schedule," of numerous levees, floodwalls, gates, and pumps within Southeastern Louisiana. Corps engineers estimated that completion of the HSDRRS would require 31,000,000 cubic yards of suitable "borrow material."[2]

In order to acquire the needed material, the Corps considered three options: (1) "government-furnished" borrow material, (2) "contractor-furnished" borrow material, and (3) supply contracts. Only the government-furnished and contractor-furnished options are relevant to this appeal.

Under the government-furnished option, the Corps would seek to directly obtain the property rights to extract borrow material from an identified piece of land. Under the contractor-furnished option, the Corps would require construction contractors to work "in partnership with a landowner to provide suitable borrow material from the landowner's property."

In 2008, the Corps considered acquiring the rights to mine government-furnished borrow material on Idlewild, a tract of land owned by White Oak Realty, LLC ("White Oak"). In response, White Oak, fearing a potential eminent domain action against its property, sent the Corps letters informing the Corps that it was "pursuing the property for contractor supply borrow material," and requesting that the Corps "cease and desist any and all activity

---

[2] "Borrow material" refers to soil "dug in one location for use at another."

2

pertaining to government supplied borrow at Idlewild." The Corps declined to cease consideration of Idlewild as a source of government-furnished borrow material. Nonetheless, the Corps informed White Oak that it remained "free to utilize [its] property in any manner" pending further notification on the Corps's intentions. The Corps never pursued an eminent domain action.

In 2009, White Oak applied for a permit to excavate clay on Idlewild as a source for contractor-supplied borrow material. The Corps pre-approved[3] the permit in October 2010 — with a caveat. As part of its review, the Corps had determined that clay excavation on Idlewild would cause adverse environmental impact on bottomland hardwood forests ("BLH"). To offset that impact, the Corps required mitigation of those environmental impacts "through the purchase of mitigation bank credits." Purchase of bank credits was only required, however, if Idlewild's resources were excavated "for use in building the HSDRRS." "[I]f borrow excavated at [Idlewild] [was] not used in the construction of a [Corps] water resources project, there [was] no [Corps] requirement that impacts to non-wetland bottomland hardwoods be mitigated."

Upset by the cost of available mitigation bank credits, White Oak proposed to fulfill its mitigation requirements by placing 158.36 acres of "wetland and jurisdictionally determined non-wetland" forest in a conservation servitude. The Land Trust for Southeast Louisiana would then work to ensure that the land remained pristine.

---

[3] Pre-approval did not guarantee that the Corps's contractors would select Idlewild as a source of borrow material. It merely meant that the Corps would list Idlewild as a pre-approved site. Contractors were "not obligated to select a site from the contractor-furnished clay source list." "Agreements for use of a contractor-furnished site would solely be between a construction contractor and the landowner, and at no point in time would the landowner have an agreement with the [Corps]."

No. 17-30438

The Corps rejected White Oak's proposal on the grounds that mitigation bank credits were "preferred by both statute and regulation" and were "the most efficient, timely and effective means to achieve the required compensatory mitigation for impacts to contractor-furnished borrow area." The Corps further explained that the "creation and approval of a mitigation plan is a lengthy and detailed process that can take a year or more." "Not only [did] the [Corps] not have the manpower to devote to this process for every contractor-furnished borrow site, but it would significantly delay the approval and use of those sites."

The parties then exchanged correspondence for a number of years discussing whether a non-mitigation bank alternative would suit the Corps. Eventually, on February 20, 2013, District Commander Edward Fleming sent a final notice to White Oak reiterating the bank credit mitigation requirement.

In response, White Oak filed the instant suit against the Corps on June 10, 2013, alleging that: (1) the Water Resources Development Act ("WRDA") does not authorize the Corps to require private parties to pay for the mitigation costs, (2) the WRDA does not authorize the Corps to require purchase of mitigation bank credits in this instance, and (3) a taking under the Corps's mitigation plan would be unconstitutional under the Fifth Amendment.

Shortly thereafter, the Corps filed a motion to dismiss the complaint for lack of Article III standing, which the district court denied. The parties then filed cross motions for summary judgment. After summary judgment briefing had concluded, White Oak moved to supplement the administrative record.

On May 4, 2016, the district court denied White Oak's motion to supplement as untimely and unnecessary. The court subsequently granted summary judgment in favor of the Corps on all claims. This appeal timely followed.

4

No. 17-30438

## STANDARD OF REVIEW

"This court reviews a grant of summary judgment *de novo*, applying the same standard to review the agency's decision that the district court used." *Baylor Cty. Hosp. Dist. v. Price*, 850 F.3d 257, 261 (5th Cir. 2017).

As an initial matter, White Oak claims that the district court erred in applying *Chevron* deference to the Corps's interpretation of the WRDA. White Oak argues that only *Skidmore* deference is owed because the Corps's interpretation does not carry the force of law. *See Skidmore v. Swift & Co.*, 323 U.S. 134 (1944).

"To determine the appropriate level of deference to the [Corps's] interpretation of the [WRDA], we are guided by the two-step analysis set forth in *United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001)." *See Knapp v. U.S. Dep't of Agric.*, 796 F.3d 445, 454 (5th Cir. 2015). "[A]dministrative implementation of a particular statutory provision qualifies for *Chevron* deference when it appears [(1)] that Congress delegated authority to the agency generally to make rules carrying the force of law, and [(2)] that the agency interpretation claiming deference was promulgated in the exercise of that authority." *Mead*, 533 U.S. at 226-27. "It is fair to assume generally that Congress contemplates administrative action with the effect of law when it provides for a relatively formal administrative procedure tending to foster the fairness and deliberation that should underlie a pronouncement of such force." *Id.* at 230.

Congress delegated to the Corps the power to develop mitigation plans under the WRDA. *See* 33 U.S.C. § 2283(d). Congress further provided for a formal administrative procedure for developing those plans, requiring the Corps to "make a draft of the plan available for review and comment by applicable environmental resource agencies and the public," and "consider any comments received from those agencies and the public on the draft plan." *See*

*id.* § 2283(h)(7). The record indicates that the Corps promulgated the mitigation requirements pursuant to these procedures. Accordingly, the district court properly afforded the Corps's decisions *Chevron* deference. *See Mead*, 533 U.S. at 226-27, 230.

Under *Chevron*, we employ a two-step analysis when reviewing an agency construction of a statute. First, we answer "the question whether Congress has directly spoken to the precise question at issue." *See Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837, 842 (1984). "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842-43. "If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute[.]" *Id.* at 843. "Rather . . . the question for the court is whether the agency's answer is based on a permissible construction[.]" *Id.*

## DISCUSSION

White Oak presents four arguments on appeal. First, White Oak challenges the Corps's power under the WRDA to impose the mitigation requirement on a private party. Second, White Oak contends that the Corps violated the WRDA by demanding that White Oak purchase wetland mitigation bank credits. Third, White Oak claims that the mitigation requirement amounted to an unlawful taking under the Fifth Amendment. Fourth, White Oak asserts that the district court erred in denying its request to supplement the record.

Before turning to the merits of White Oak's arguments, however, we first address the Corps's contention that White Oak lacks Article III standing to assert any of its claims.

No. 17-30438

## I.   White Oak has Article III standing.

The Corps maintains that White Oak lacks Article III standing because it cannot allege an injury. First, the Corps claims White Oak did not possess a property interest in the borrow material at the relevant time. Second, the Corps argues that White Oak's "lost profits or lost business opportunities" are entirely speculative. We disagree.

"Because the WRDA establishes no specific right to judicial review of an agency action, [White Oak] must establish standing under the general provisions of the APA." *Envtl. Def. Fund v. Marsh*, 651 F.2d 983, 1003 (5th Cir. Unit A Jul. 1981). To do so, White Oak "must allege some injury in fact, and that the injury is arguably within the zone of interests[4] to be protected or regulated by the statutes that the agencies (are) claimed to have violated." *Id.* (internal quotations omitted). "The Supreme Court has indicated that courts should not be austere in granting standing under the APA to challenge agency action taken pursuant to a statute." *Id.*

The Corps asserts that the mitigation requirement could not have injured White Oak because "White Oak did not own the borrow" at the relevant time. Though White Oak did sell the right to mine the clay from its property, the purchase price was $5.60 "per ton of Materials mined and removed." White Oak therefore retained an ongoing financial interest in mining the clay, which, White Oak asserts, the Corps's mitigation requirements inhibited by excluding White Oak from the borrow market. White Oak's retained financial interest in the per ton purchase price, and alleged injury thereto, is sufficient to establish Article III standing. *See Cottrell v. Alcon Labs.*, 874 F.3d 154, 163 (3d Cir. 2017) (quoting *Danvers Motor Co. v. Ford Motor Co.*, 432 F.3d 286, 291, 293 (3d Cir.

---

[4] The Corps does not argue that White Oak's alleged injuries fall outside of the WRDA's "zone of interest." We therefore do not address that issue on appeal.

2005)) (stating that financial harm is a "classic" and "paradigmatic" form of injury in fact).

The Corps next argues that any potential lost business opportunities are "entirely speculative" because "contractors may choose their own sites from which to obtain borrow" and "there was no guarantee that Idlewild borrow would ever be used." The record shows that the lost business opportunity was not as speculative as the Corps asserts. The mining company that held the rights to White Oak's borrow material had a contract to provide borrow from Idlewild in connection with specific Corps's contracts. The mining company's contract was "contingent upon acceptance of the pit" by the Corps. "It is unrealistic to believe that these Corps [mitigation requirements] [did] not have a direct impact" on the fulfillment of that contract. *See Marsh*, 651 F.2d at 1004.

The district court did not err in concluding that White Oak had Article III standing to bring its claims. We accordingly turn to the merits of White Oak's arguments on appeal.

## II.    The mitigation requirement is permissible.

White Oak first argues that the Corps's mitigation requirement conflicts with the WRDA for two reasons: (1) it is inconsistent with WRDA provisions requiring mitigation planning prior to project implementation; and (2) the WRDA does not grant the Corps authority to require private parties to pay for mitigation. Neither argument has merit.

### 1.    Corps reasonably required mitigation for Idlewild impacts.

According to White Oak, the Corps's "*post hoc* imposition of mitigation responsibility" conflicts with the WRDA's requirement that the Corps "assess potential impacts and submit a specific plan for mitigation as part of a project proposal . . . before it is approved." We are unpersuaded.

There are, as White Oak asserts, provisions in the WRDA indicating that the Corps must undertake mitigation prior to project implementation and budgeting. For example, § 2283 states that mitigation "*shall* be undertaken or acquired *before* any construction of the project." 33 U.S.C. § 2283(a)(1) (emphasis added). Section 2283 further states that the Corps "*shall* not submit any proposal for the authorization of any water resources project" unless that proposal contains a "specific plan to mitigate for damages to ecological resources." *See id.* § 2283(d)(1) (emphasis added). These provisions provide some support to White Oak's argument that mitigation plans must be set forth in advance of project implementation.

The WRDA is not, however, as clear as White Oak asserts. For instance, § 2283 also states that the Corps may implement mitigation requirements "*concurrently* with lands and interests in lands for project purposes." *Id.* § 2283(a)(1) (emphasis added). Likewise, Congress authorized the Corps to "mitigate damages to fish and wildlife resulting from any water resources project under [its] jurisdiction, *whether completed, under construction, or to be constructed.*" *Id.* § 2283(b)(1) (emphasis added). Section 2280, regarding budgeting, provides that a total budget "shall be automatically increased" for mitigation authorized by the WRDA. These provisions indicate that the Corps can account for, and impose, mitigation as needed during the course of a project.

The WRDA is, therefore, ambiguous with respect to whether the Corps may impose mitigation requirements after project implementation. As a result, we may not "impose [our] own construction" on the statutory language. *Chevron*, 467 U.S. at 843. Rather, "the question for the court is whether the [Corps's] answer [to this issue] is based on a permissible construction of the statute." *Id.* It is.

The Corps interprets the WRDA as requiring mitigation for all "habitat losses caused by water resources projects." Following that reasoning, the Corps concluded that "impacts to [BLH] associated with borrow that will be used in construction of a [Corps] water resources project must be mitigated." Therefore, the Corps determined that the WRDA required mitigation for any impact to Idlewild "if . . . selected by construction contractors for use in building the HDRRS." This is an entirely permissible construction of the statute.

The WRDA commands that the Corps mitigate for any impacts "resulting from" or "created by" a water resource project. 33 U.S.C. §§ 2283(b)(1), (d)(1). To fulfill that mandate, Congress authorized the Corps to mitigate damages resulting from "*any* water resources project under [its] jurisdiction." *Id.* § 2283(b)(1) (emphasis added). Indeed, Congress expressly stated its intent that the Corps "include environmental protection as one of the primary missions of the Corps of Engineers in planning, designing, constructing, operating, and maintaining water resources projects." *See id.* § 2316(a).

The district court did not err in concluding that the Corps's mitigation requirement was a reasonable interpretation of this statutory scheme and was therefore entitled to *Chevron* deference.

**2.     Corps reasonably required White Oak to bear costs.**

White Oak next argues that the mitigation requirement fails *Chevron* deference because it adds private entities to a statutory scheme that unambiguously excludes them. Again, we disagree.

Contrary to White Oak's contention, the WRDA does not unambiguously exclude the option of shifting mitigation costs to third-parties. In fact, "mitigation costs . . . shall be subject to cost sharing or reimbursement to the same extent as such other project costs are shared or reimbursed." *Id.* § 2283(c).

Without a doubt, the WRDA does not define the meaning of "third-party mitigation arrangement" in great specificity. There is also a lack of detail on the "extent" of permissible "cost sharing" and "reimbursement." That is to say, the WRDA is ambiguous on the question presented. As a result, "the question for the court is whether the [Corps's] answer [to this issue] is based on a permissible construction of the statute." *See Chevron*, 467 U.S. at 843.

In light of the statutory provisions cited above, we conclude that it is. The district court did not err in concluding that the Corps reasonably interpreted the WRDA in shifting the initial mitigation costs to private parties.

## III.   The purchase requirement is permissible.

White Oak argues unconvincingly that the Corps violated the WRDA by limiting White Oak's mitigation options to the purchase of upland mitigation bank credits.

White Oak's argument is essentially that the Corps violated the WRDA's preference for "in-kind" mitigation by demanding the purchase of "wetland" mitigation bank credits for the loss of "upland" forests. This argument fails to recognize that the WRDA only requires "in-kind" mitigation "to the extent possible." 33 U.S.C. § 2283(d)(1). There is no evidence that the Corps unreasonably concluded that in-kind mitigation was not possible in this instance.

The parties agree that no upland BLH credits were available to purchase. White Oak's only proposed in-kind alternative was its conservation lien plan. The Corps rejected this alternative, however, on the grounds that it would be less efficient, timely, and effective than requiring the purchase of wetland mitigation credits. Further, the Corps stated that it did not have the resources to devote to the extensive process of reviewing the plan. White Oak has presented no evidence that the Corps unreasonably reached that conclusion.

11

We therefore agree with the district court that the purchase requirement "is in line with the plain language of the WRDA and is a reasonable interpretation thereof."

## IV. There was no unconstitutional taking.

White Oak contends that the Corps's mitigation and purchase requirements amount to an unconstitutional taking under the Fifth Amendment. The argument is meritless. Indeed, White Oak cannot meet either prong of a takings analysis.

"When evaluating whether governmental action constitutes a taking, a court employs a two-part test." *Hearts Bluff Game Ranch, Inc. v. United States*, 669 F.3d 1326, 1329 (Fed. Cir. 2012). "First, as a threshold matter, the court determines whether the claimant has identified a cognizable Fifth Amendment property interest that is asserted to be the subject of the taking." *Id.*; *see also Dennis Melancon, Inc. v. New Orleans*, 703 F.3d 262, 269 (5th Cir. 2012) ("[A] plaintiff first must demonstrate that he has a protectable property interest[.]"). "Second, if the court concludes that a cognizable property interest exists, it determines whether that property interest was 'taken.'" *Hearts Bluff*, 669 F.3d at 1329.

White Oak's takings claim fails to assert either a protected property interest or a taking.

First, White Oak has no property interest in selling borrow material to the Corps's contracting program. In its efforts to sell to the Corps, White Oak voluntarily[5] entered into a market over which the Corps possessed strong

---

[5] White Oak claims that the Corps "forced" it to excavate clay on part of Idlewild, which then effectively deprived White Oak of use of the remaining land because of the prohibitive mitigation costs needed to continue excavation. There is no evidence in the record that the Corps ever "forced" White Oak to pursue participation in the borrow material market.

regulatory control. "[A] protected property interest simply 'cannot arise in an area voluntarily entered into . . . which, from the start, is subject to pervasive Government control[.]'" *Dennis*, 703 F.3d at 272 (omission in original) (quoting *Mitchell Arms, Inc. v. United States*, 7 F.3d 212, 216 (Fed. Cir. 1993)).

Second, even if White Oak could allege a protected property interest, such as the right to sell borrow to non-Corps entities or otherwise commercially develop its property,[6] White Oak has failed to show that the Corps ever "took" any property. From the beginning, the Corps informed White Oak that it was "free to utilize [its] property in any manner [it] choose[s]." The Corps then pre-approved Idlewild as a borrow site, thus granting White Oak the ability to mine borrow material for Corps's projects, subject to the mitigation requirement. At worst, the mitigation requirement frustrated White Oak's ability to sell its clay to Corps's contractors at a competitive price. However, "[f]rustration and appropriation are essentially different things." *Omnia Commercial Co. v. United States*, 261 U.S. 502, 513 (1923). White Oak "has done no more than [complain] that a prospective business opportunity was lost." *See United States v. Grand River Dam Auth.*, 363 U.S. 229, 236 (1960). Indeed, White Oak's owner could not identify any damage to White Oak outside a lost business opportunity. This is insufficient to establish a "taking" under the Fifth

---

[6] White Oak purchased Idlewild with the intent to commercially develop the property, and argues that clearing the BLH on Idlewild cannot require mitigation under the WRDA because White Oak cleared the BLH prior to obtaining a Corps's contract and would have done so for its planned development project either way. This argument is unpersuasive for at least three reasons. First, it is unsupported by the record. There is no indication that White Oak cleared Idlewild for any purpose other than participation in the federal borrow material market. Second, the Corps only required mitigation if the borrow material was used for a Corps project. Therefore, if White Oak cleared Idlewild for a non-Corps related purpose, no mitigation would be required. Third, White Oak's theory would allow parties to avoid the WRDA's mitigation requirements by impacting the environment prior to receiving a Corps contract, even when that impact results from a clear intent to sell to the Corps. This would be contrary to Congress' intent that the Corps mitigate impacts resulting from Corps's projects. *See* 33 U.S.C. § 2316(a).

Amendment. *See Allain-Lebreton Co. v. Dep't of Army*, 670 F.2d 43, 45 (5th Cir. 1982) (finding no taking where "the company's complaint [was] that the Corps refuses to conduct its affairs so as to help the company develop its land").

Accordingly, the district court did not err in granting the Corps summary judgment on White Oak's takings claim.

## V.     No error in declining to consider supplemental evidence.

Finally, White Oak urges us to consider the Corps's Comprehensive Environmental Document ("CED"), which was not part of the administrative record during summary judgment briefing, because, according to White Oak, the CED "is inconsistent with the decision to impose mitigation" on Idlewild. We decline to do so.

"When reviewing an agency action under the APA, we review 'the whole record or those parts of it cited by a party.'" *Medina Cty. Envtl. Action Ass'n v. Surface Transp. Bd.*, 602 F.3d 687, 706 (5th Cir. 2010) (quoting 5 U.S.C. § 706). "Supplementation of the administrative record is not allowed unless the moving party demonstrates 'unusual circumstances justifying a departure' from the general presumption that review is limited to the record compiled by the agency." *Id.* (quoting *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1002 (D.C. Cir. 2008)).

Neither party cites persuasive authority that evidence of an inconsistent agency decision is the type of "unusual circumstance" justifying supplementation. Nonetheless, we need not determine that issue. Even assuming that evidence of an inconsistent decision could justify supplementation, the district court correctly determined that the CED is not inconsistent with record evidence and adds nothing to the consideration of this case.

## CONCLUSION

Having found no error in the district court's analysis, we AFFIRM in full.